[Civ. No. 7684. Third Dist. Sept. 25, 1950.]

JOE NULAND et al., Respondents, v. S. R. PRUYN et al., Appellants.

Taft, Wright & Hopkins for Appellants.

Schofield, Hanson & Scholars, Ralph Bancroft and Leo C. Dunnell for Respondents.

VAN DYKE, J.—After decision of this cause by an opinion heretofore filed we granted a rehearing on the petition of respondents. Our purpose in doing so was to give further consideration to the decision so made and to certain points in respect thereto raised by respondents' petition. Further consideration of these matters, however, leads us to the conclusion that the opinion heretofore filed herein correctly and adequately disposes of the issues raised on the appeal and for that reason we adopt the opinion heretofore rendered as our present opinion. That opinion is as follows:

"By their complaint in this action the plaintiffs alleged that on June 26, 1944, they and the defendants entered into

a written agreement whereby the parties thereto agreed to the creation of a partnership for the operating of a radio repair and service business in Vallejo, California, for a period of five years. This written agreement is not set out in *haec verba* in the complaint, but its alleged legal effect is pleaded. Plaintiffs further alleged that they entered upon the performance of the agreement and fully performed their obligations thereunder until on or about September 6, 1944, on which date they were by the defendants wrongfully excluded from participation in the business and prevented from further performance. They pleaded that on that date and in contravention of the partnership agreement the defendants, without cause, served upon them a written notice of election to terminate the partnership and that the service of the same was a part of a joint and concerted action and conspiracy by defendants against them for the purpose of excluding them from participating in the management and profits of the partnership. They alleged that thereupon defendants immediately took exclusive charge and possession of the partnership business and wrongfully excluded the plaintiffs therefrom thereafter, in the meantime refusing them access to the partnership records and refusing any accounting of the business. They claimed these acts made a dissolution of the partnership necessary; that defendants thereby caused a dissolution of the partnership in contravention of the partnership agreement. They alleged resulting damages consisting of the loss by them of their share of the profits of the partnership from the date of the exclusion to the date of accounting and that an accounting of the partnership affairs was necessary. They prayed for an order dissolving the partnership and, based upon a requested finding that the dissolution was wrongfully caused in contravention of the partnership agreement, they asked damages for the breach of the agreement, an account of the business to determine their share of profits, the appointment of a referee to take such account and for judgment for any amount found due them.

"The defendants answered, denying virtually all of the foregoing allegations of the complaint.

"Upon the pleadings so framed the case went to trial. At the outset the question of whether the written agreement, admittedly executed but denied as to the alleged legal effect, created a partnership or merely an employment of plaintiffs by defendants, received the attention of the trial court. Con-

siderable evidence was taken concerning the facts, circumstances and conditions surrounding the execution of the agreement and of the conduct of the parties thereafter. The court then announced its determination that the contract not only spoke for itself, but that it was a partnership agreement. The court thereupon ordered that an account be taken of the partnership business and referred the taking of that account to a referee, who thereafter proceeded to take the account and upon completion thereof filed with the court her referee's report. The court adopted this report, which determined that there was due to the plaintiffs the sum of $4,039.05 each and thereafter entered judgment in their favor, adjudging that each of them recover that sum against the defendants jointly and severally. From this judgment this appeal is taken.

"Herein the appellants contend that the court misconstrued the contract. To the determination of this contention it will be necessary to refer to the terms and provisions of the agreement somewhat at length. By the terms of the agreement appellants here, S. R. Pruyn and J. R. Busby, are collectively referred to as the first party thereto and the respondents here, Joe Nuland and Alva Leo Archer, are collectively referred to as the second party. The agreement recites that the first party is the owner and operator of a certain radio repair and service business in Vallejo, and the second party represents and declares that they are expert radio service and repairmen, experienced and qualified in the matter of repairing, rebuilding and servicing radio receiving sets and kindred items. It is then recited that the parties desire that the second party devote their services to the radio repair and service business under the terms and conditions set forth. In consideration of these premises detailed provisions are made concerning the proposed actions and obligations of the parties thereunder. It is agreed that the first party (appellants here) shall not be called upon to render any services whatever in the conduct of the business, but may do so if they desire. On the other hand, Nuland is required to devote to the business not less than five eight-hour days each calendar week. Archer is required to devote his full and exclusive time to said business and is forbidden to accept other or different employment of any kind or character whatsoever. He agreed to work not less than six eight-hour days each calendar week. The parties agreed that the initial value of the tools, equipment, materials, supplies and stock in trade of the business was reasonably worth $2,500. It was stipulated that 'fifty (50%) per cent

of the gross receipts' of the business should be deposited in a bank account to be known as 'the fund' from which only the first party jointly or severally might draw; that from this fund moneys would be withdrawn by the first party from time to time until they had received $2,500 as 'repayment for their investment and/or purchase price' of the aforesaid property. Then the funds were to be accumulated, never falling below a balance of $1,000. The excess over that was to be withdrawn not less than once a month and divided equally between the parties 'as dividends from the operation of said business.' However, if it should turn out that said balance was insufficient to properly operate the business, then the parties agreed that they might, by mutual agreement, increase the amount of the balance. All operating expenses of the business were to be paid from 'the fund.' It was further agreed that the remaining fifty per cent of the 'gross receipts' should be equally divided between the first and second parties not less than once each calendar month. The second party was charged with the duty of purchasing supplies and materials, but could not make such purchases in excess of $50 from any source without written consent of the first party and no power was given to incur obligations otherwise without first obtaining such written consent. The parties agreed to keep accurate books of account to which all should have access. The agreement provided the term thereof would be a period of five years, but if Nuland or Archer were inducted into the armed forces or for any reason became physically incapable of performing their duties then the 'first party may, at his option or election, terminate the within agreement by giving notice in writing to the second party or any member thereof of his intention so to do, fifteen (15) days in advance of such termination.' If the second party either jointly or severally violated or breached the agreement the first party could forthwith cancel and terminate the same by giving written notice of intention so to do to either member of the second party. If second party faithfully performed their duties then upon the expiration of the term of the agreement the personal property constituting the physical assets of said business should be divided equally between the first party and the second party. Finally, it is declared to be the intention of the parties that Nuland and Archer shall devote their best interests and efforts towards the success of the business, conduct themselves in a sober and businesslike manner and refrain from intoxication or other

practices which might tend to injure the reputation or good name of the business.

"Over the proper interpretation of this agreement as constituting a partnership or, on the other hand, a contract of employment, the parties to this appeal, both in their briefs and in their arguments, have wholly disagreed. Appellants contend that without regard to the evidence and merely taking the agreement 'by its four corners' the object to be attained by the original owners of the business was to secure the services of competent men to be employed in the radio repair business. They point to the way in which the agreement makes a unit of Pruyn and Busby and the second unit of Nuland and Archer; to the stated purpose of the first party to obtain expert and experienced repairmen; to the stated purpose of the second party to devote their services; to the control by the first party of all the funds; to the limitations placed on the second party in respect of the expenditure of moneys and the incurring of obligations; to the expressed giving to the first party of the power of termination, whereas no such power is stated to be in the second party; to the requirements concerning conduct of the second party without such restrictions being placed upon the first party; to there being no declared obligation moving from the first party to the second party other than the payment of compensation; to the lack of a provision for the sharing of profits and the presence of a provision for 'compensation' from 'gross profits'; to the lack of any express declaration of intent to form a partnership; to there being no requirement for capital contribution by the second party nor pledge of credit thereby nor provision expressed for liability for losses. And from these things they conclude that *on its face* the contract is one of employment only.

"On the contrary, the respondents say the contract fully measures up to the code definition of a partnership, to wit, 'an association of two or more persons to carry on as co-owners a business for profit' (Corp. Code, § 15006, subd. (1)); that the code further declares (Corp. Code, § 15007, subd. (2)) the receipt by a person of a share of profits is prima facie evidence that he is a partner, although no such inference is to be drawn if profits are received as payment; that the use of the word 'partnership' is not essential to the formation of one; that the question of partnership or not is a matter solely of the intention of the parties to do the things which partners do; that the agreement refers to an agreed value of personal

property then being used in the business and provides for the withdrawal of the agreed amount 'as repayment for their investment and/or purchase price' thereof, meaning that the then owners agreed to accept the stipulated value in payment for such property which would thereafter belong to the business, that is, to the parties in common as coowners. They point to the provision for maintenance of the balance in the business funds of $1,000, thus providing working capital and to the final provision for equal division of all assets upon expiration of the agreed term. They cite authorities to the effect that the lack of capital contribution by one or more partners does not prevent the relationship of partners. They argue that the absence of any reference to liability for debts is supplied by inference and is absent from many agreements of partnership. They say the inequality of control is a matter which can be agreed upon between partners *inter se* and they conclude that the agreement has all of the content necessary to the formation of a partnership.

"It seems apparent that we have here an instrument which presents, insofar as its interpretation is concerned, questions of fact rather than of law. The agreement is ambiguous and uncertain in respect of the matters here in question and comes within the rules governing the interpretation of such documents.

" '. . . Whether a contract is in any of its terms ambiguous or uncertain is a matter of determination in the first instance by the trial court. If it is found so to be, it is primarily the duty of such court to construe it, after a full opportunity afforded the parties to produce evidence of the facts, circumstances and conditions surrounding its execution, and the conduct of the parties relative thereto. . . . And where a writing is so uncertain that either of the two constructions urged might be sustained, it is not within the functions of a court of review to declare that the interpretation given by the trial court should be supplanted by the other construction of which the instrument is susceptible.' (6 Cal.Jur. 327, § 192.)

"Illustrative of this principle is the case of *Slama Tire Protector Co.* v. *Ritchie*, 31 Cal.App. 555, 562 [161 P. 25]. In that case an agreement had been made concerning the sale and distribution in a given territory of a certain tire protector device and the question before the court was whether the contract was one of sale or one whereby an agency was created

and the goods which were the subject of the agency had been consigned to the agent and not sold to him. After discussing the terms of the contract and pointing out the uncertainties therein, the court said:

" 'Thus we could proceed and point out other language of the contract which, taken alone or viewed in connection with the provisions of the instrument above referred to, clearly implies that the contract was intended to establish the relation of principal and agents between the parties and not intended as a contract for the sale of the goods; but it is unnecessary further to examine the contract for this purpose. The instrument is presented herein in full, and there can be no difficulty in observing from its language that the conclusion arrived at by the court below as to its legal nature, scope, and effect involves a reasonable view of the language of the writing.

" 'We do not say that the provisions of the contract above specifically adverted to are wholly inconsistent with the theory that the transaction was intended as a contract of sale. What we do say is that the provisions are perfectly consistent with a contract creating an agency. . . .

" 'As suggested, however, it must be admitted that the contract contains some language which, if considered by itself or without reference to or consideration of other language of the instrument, might warrant the construction to which the writing is subjected by the plaintiff, viz., that it involves an agreement for the absolute sale of the tire protectors to the defendants. Indeed, it may justly be assumed to be true that the instrument is so characterized by ambiguity and uncertainty as to the nature of the relation which the parties intended thereby to create between themselves that either of the two constructions of the contract urged by the respective parties might, upon reasons equally cogent, be sustained. The question, therefore, then arises, assuming, of course, that no competent testimony extrinsic to the writing itself reflecting light upon the real intention of the parties has been received: Is it, in such a situation, within the proper or legal functions of a court of review to declare that the construction given the writing by the trial court should be rejected and supplanted by the other construction of which the instrument is susceptible? Manifestly, no reason can be conceived which would support an affirmative reply to that question. The appeal court could not adopt such a course in such a case without resorting to the exercise of arbitrary power.'

"The principle declared in the foregoing authority has

found approval in later cases, among which may be cited *Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576, 582 [300 P. 34]. Therein, concerning the principle here involved, the Supreme Court said:

" '. . . The construction given the instrument by the trial court appears to be consistent with the true intent of the parties and where that is the case the appellate court will not substitute another interpretation though it seem equally tenable.' See, also, *Manley* v. *Pacific Mill & Timber Co.*, 79 Cal.App. 641, 648 [250 P. 710].

"As of July 31, 1946, the court made and filed findings of fact and conclusions of law, whereby it found to be true all of the allegations of plaintiffs' complaint and in addition specifically found that the partnership was entered into in writing on the 26th of June, 1944; that no accounting had been had of the partnership assets; that such account was necessary in order to ascertain the amounts due the plaintiffs from defendants; that defendant Busby was presently in possession of all partnership assets, having purchased all right, title and interest therein of defendant Pruyn; that all of the allegations of defendants' answer to the complaint were untrue, and that defendants had wrongfully caused a dissolution of the partnership, the plaintiffs being without blame therein. As conclusions of law the court declared:

" '1. That the partnership heretofore existing between the plaintiffs and the defendants be and the same is hereby declared to be dissolved, the defendants having wrongfully caused the same by their conduct. . . .

" '3. That the defendants be, and they are hereby required to render to the above entitled court a full and complete accounting of all transactions of the said partnership including all profits arising therefrom from the beginning of said venture up to and including the dissolution thereof.'

"On April 9, 1947, the court entered an interlocutory decree. This decree recited that on February 13, 1946, the court 'did cause to be entered in its minutes that there was since on or about the 26th day of June, 1944, a partnership' existing between the parties; that it had theretofore filed findings of fact and conclusions of law; that it now appeared no final decree in the cause could be made until an accounting had been had for the purpose of determining the value of the properties and business of the partnership and of plaintiffs' interest therein. It then ordered that the partnership there-

tofore existing be and it was thereby declared to be dissolved; that Georgia H. Crowley be appointed a referee to take the account, the parties being ordered to produce before the referee all books, papers and writing in their possession and under their control, relating to the business. The referee was empowered to examine the parties and the witnesses and was declared to have all the powers conferred on referees by law.

■ "It is to be noted that the court by the findings of fact which it had made and entered had found that on September 6, 1944, appellants had, in contravention of the partnership agreement, wrongfully served on plaintiffs written notice of their election to terminate the partnership; that plaintiffs had not committed any breach of the agreement; that the serving of the notice was part of a joint and concerted action and conspiracy by defendants against plaintiffs with the intent of excluding plaintiffs from the management of the business and participation in profits and that thereupon respondents had wrongfully taken exclusive charge and possession of the partnership business, and had excluded and still continued to exclude plaintiffs therefrom. Appellants contend these finding are utterly without support in the evidence. This contention must be sustained.

"Respondents' only witnesses were the appellants themselves, called under section 2055 of the Code of Civil Procedure. Their testimony, insofar as it relates to the matter now under discussion, contains nothing that could be construed as sustaining the above findings and on the contrary would support a conclusion that the notice of termination was given for good cause. Busby testified that Nuland purchased the bulk of the parts that were acquired and never obtained defendants' permission as required by the agreement. Pruyn testified that Nuland and Archer did not close their radio store in San Francisco, although the agreement specifically provided that Nuland was to devote not less than five eight-hour days each calendar week to the partnership business and Archer was required to devote his full and exclusive time thereto, accepting no other or different employment of any kind. He was to work not less than six eight-hour days each calendar week. Finch, who had been employed in the shop between the date of the agreement and the giving of notice, testified that he never saw Nuland in the shop and that Archer was not an experienced or qualified radio repairman, but on the contrary was an amateur. In entering into the agreement both men had represented that they were expert

radio service and repairmen, experienced and qualified in the matter of repairing, rebuilding and servicing radio receiving sets. The foregoing is the only testimony contained in the record bearing on the question of whether or not the notice of termination was given without cause. Although respondents were present in court, they did not take the stand to deny or refute or explain such evidence, but remained silent. Under this state of the record, not only were the trial court's findings above referred to without support in the testimony, but they were in conflict with the only testimony given in the case. The significance of this lack of support for the court's finding of wrongful exclusion will now be discussed.

"The notice of termination given by appellants to respondents on September 6, 1944, was in writing and it was stated therein that it was for cause. It was declared to be effective as of its date. Partners may among themselves contract freely concerning many matters, including the right on the part of any of the members to terminate the partnership. On this matter the agreement contained the following provision: 'In the event of a breach or violation of the terms and conditions of the within agreement by the party of the second part, either jointly or severally, the first party may at its option and election, forthwith cancel and terminate the within agreement by giving written notice of its intention so to do to the second party or any member thereof.' If this notice of termination was in fact given for just cause, as the only evidence taken upon that point indicated that it was, then the partnership ended as of the date of its giving, and while the respondents, even so, might well have been entitled to an accounting on the theory that the parties had been copartners, yet that accounting must have proceeded upon different principles than did the accounting which was actually taken. If the partnership was by the notice rightfully dissolved on September 6, 1944, appellants' rights would have been as follows: They would have been entitled to have their ownership in the assets determined as of that date and paid over to them in money or in kind; if this was not done and their property was used in the business they would have had, on account being taken, an election to receive their property and to share in the profits made thereafter in the proportion their property bore to the whole or to be paid interest on the value of their property so used. See annotation to *Forbes* v. *Becker*, 80 A.L.R. 12, concerning accountability of partner or joint adventurer for

profits earned subsequently to death or dissolution, subdivision VI (p. 58). It is therein stated that: 'Admitting the liability of a partner to an accounting for profits earned subsequently to dissolution, as established by cases cited in prior divisions of the annotation, the question is at once presented, to what extent the other partner or his legal representatives shall be entitled to share in such profits, or, in other words, how shall the subsequently earned profits be apportioned between the parties. . . . The basis upon which a partner or his legal representative is held entitled to an accounting for profits earned after dissolution has been said to be, the use to which his interest in the capital of the firm has been put in earning such profits.' *White* v. *Reed,* 124 N.Y. 468 [26 N.E. 1037], is cited by the author of the annotation as holding that 'the granting relief of that character does not proceed on the ground that the party seeking it is a member of a continued partnership, but rests upon the fact that, when he retired from the firm, he had some remaining interest in the capital appropriated and used in the continuance of business by the other partners.' Massachusetts cases are cited as holding 'the liability of the surviving members is simply to make compensation for the money they have used.' It is then stated that 'In accordance with this view, it has been held that one claiming an interest in profits earned subsequently to the dissolution of a partnership is entitled to such share of the profits as his interest in the capital of the firm bears to the total capital, or, in other words, such share of the profits as can rightly be attributed to the continued use of his property or capital in the business. Such would seem to be the generally accepted rule.' Cited in support of this statement are the following California cases: *Painter* v. *Painter,* 4 Cal.Unrep. 636 [36 P. 865] (later appeal in 6 Cal.Unrep. 677 [65 P. 135]) ; *Ruppe* v. *Utter,* 76 Cal.App. 19 [243 P. 715].

''On the contrary, for wrongful expulsion and continued use of assets, as found by the court, a different rule applies generally, based upon an assumption of a continued partnership, with full participation in profits according to the ratio set up in the articles of partnership, at least for the period from the wrongful expulsion to actual dissolution by circumstances or decree of court.

''It is apparent in this case that it was this latter theory upon which the court here made its final judgment after the referee had filed her report.

''From the report filed by the referee, it sufficiently appears

that she determined the liability of appellants to respondents upon the basis of profits to be equally shared by all of the parties, including in the amounts going to make up her ultimate findings the money received on sale of the business. In effect, the referee found that from the beginning of the partnership to the closing-out sale the appellants were chargeable with an excess of receipts over disbursements in the sum of $16,156.20, one-fourth of which each partner was entitled to. And the court, adopting this result, gave judgment in accordance therewith, adjudging that each of the respondents should recover from the appellants jointly and severally the sum of $4,039.05, together with interest at the rate of seven per cent upon such sum from the 19th day of March, 1946, which appears to mark the end of the period over which the accounting was taken.

''From what has been said it is apparent that the judgment given by the court cannot be sustained in the absence of a finding justifiably made and supported by the evidence that from the time the notice of termination was given the appellants wrongfully excluded respondents from the partnership affairs. As we have pointed out heretofore, such a finding has no support in the evidence, and on the contrary is in opposition to the only evidence addressed to the question of whether or not respondents had so breached their agreement that the appellants were given and exercised the right to terminate the partnership.

''For these reasons the judgment must be reversed, and in reversing the same we deem it proper to order a new trial as to all of the issues tendered by the pleadings, including those involving the interpretation of the contract between the parties. We have heretofore expressed no opinion as to a proper interpretation of that document and deem it best that no such opinion be expressed. We hold that the instrument is unclear and ambiguous in respect of this matter to a degree requiring that the parties be afforded an opportunity to introduce evidence of the facts and circumstances attending its execution and of the conduct of the parties thereunder in aid of its interpretation by the trial court. It is apparent from this record that the issue was not approached from that point of view. While the trial court did not refuse to receive such evidence, it is clear from the record that the learned trial judge considered the document to be of such nature that it could and must be construed by consideration of its terms

alone, in which conclusion we cannot join. It may well be that when the matter is approached from the point of view that such evidence is admissible, testimony may be forthcoming which will definitely clear away the uncertainties inherently within the written contract, and, as stated by the Supreme Court in *Barlow* v. *Frink*, 171 Cal. 165 [152 P. 290], it is advisable that we leave 'the matter of its construction to be determined by the trial court under such evidence as the parties desire to present, unrestrained or controlled by any expression of opinion on the subject by this court.' "

The judgment is reversed and a new trial ordered upon all issues in conformity with this opinion.

Adams, P. J., and Peek, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied November 20, 1950. Edmonds, J., Carter, J., and Spence, J., voted for a hearing.