[Civ. No. 7912.   Third Dist.   Nov. 8, 1951.]

ALICE M. DAVIS et al., Appellants, v. BASALT ROCK COMPANY, INC. (a Corporation), Respondent.

Gardiner & Riede for Appellants.

Riggins, Rossi, King & Kongsgaard and King & Ghidella for Respondent.

VAN DYKE, J.—This is an action whereby plaintiffs and appellants sought to have declared the respective rights and obligations of the parties to a written contract. By additional counts contained in the complaint, and based upon their construction of the contract, they further sought to recover damages for past breaches by defendant and respondent. Throughout the trial plaintiffs and appellants claimed that the contract was uncertain and ambiguous. They sought to introduce, and were by the trial court permitted to introduce, evidence of the facts and circumstances attending the execution of the contract as an aid to its interpretation. We think the contract was sufficiently ambiguous to justify the introduction of such evidence. ■ The result is that this court upon appeal is bound by the interpretation of the trial court where it is reasonable and is supported by the evidence introduced. (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17]; *Crillo* v. *Curtola*, 91 Cal.App.2d 263, 272 [204 P.2d 941]; *Nuland* v. *Pruyn*, 99 Cal.App.2d 603, 609 [222 P.2d 261].)

The contract was executed on May 6, 1938, between Soule Steel Company, J. E. Davis and Alice Maud Davis, his wife, as first parties, and defendant and respondent Basalt Rock Company, Incorporated, as second party. We shall refer to the parties as Soule, Davis and Basalt. It recited that Soule and Davis were the owners of an option to purchase certain real property in Napa County which would expire unless exercised before noon of the following day, May 7, 1938; that Soule and Davis would assign their option rights to Basalt which would in time exercise the option and purchase the real property at the option price of $7,500. Basalt agreed that over a period of 50 years it would sell to Soule and Davis or either of them "as they or either of them may require, such amounts of Pumicite and Vesicular Basalt of any size for plastering purposes and Pumicite and Vesicular Basalt for any other purposes of a size up to a maximum of three-sixteenths inch (3/16) mesh." The agreed price for the material to be sold was $2.50 per ton in bulk or in sacks or in other containers furnished by the purchasers, the price being declared to be "based on a blend of Pumicite and Vesicular Basalt in accordance with the formula attached." The buyers were permitted variations in the formula both as to sizes and as to the percentages of materials in the blend. The buyers could also require still greater variation and could change the materials in the mixture provided they paid the additional cost of pro-

duction. The contract declared that "all references to Pumicite are intended to refer to the Pumicite contained on the real property hereinabove mentioned, but Pumicite of equal quality may be substituted therefor"; that references to vesicular basalt were intended to refer to the vesicular basalt contained on Basalt's real property located near Napa, permission being given to substitute other vesicular basalt of equal quality. It is not necessary at this point to further detail the contractual provisions.

It appeared from the evidence and the court found that the real property to be purchased by Basalt, commonly known as the King deposit, was composed in greater part of fragmentary pumice. Specifically the court found that "contained in said real property is a deposit of an agglomerate of fragmental volcanic debris and pyroclastic material, consisting in large part of fragments of pumice, subordinate portion of fragments of nonpumiceous lavas varying in size from fine sand up to fragments several feet in diameter, and a mineral cementing the aforesaid fragments together containing silica, ferric oxide, alumina, lime, magnesia and moisture" and "that the pumice in said material has been referred to by all persons involved herein as pumicite and is herein referred to as pumicite" and "that said deposit contains approximately four million tons of said material above the present floor level of the quarry and extends to unknown depths." Basalt had for years prior to the date of the contract been engaged in the extensive production of aggregates, including materials for concrete mix. It had a number of properties from which such material was taken and owned land from which it procured a vesicular basalt referred to in the contract. It had conducted many experiments through the years concerning the materials it was producing and had use for the material contained in the King Deposit. Soule and Davis on the other hand had likewise been experimenting for some time, endeavoring to fix upon a method of producing from the vesicular pumice and basalt found in the Napa region a lightweight plaster mix. Basalt was not particularly interested in plaster such as Soule and Davis were endeavoring to produce and they in turn were not interested especially in concrete mix or building block material produced and sold by Basalt. They had not completed their determinations as to a proper formula for plaster mix, but believed themselves close to that result. The formula referred to in the contract was not even ready when

the contract was signed, but was completed and attached to the contract about a week thereafter. It read as follows:

*"By Volume*

    40% pumicite—Minus 10 mesh and Plus 20 mesh

    20% Vesicular Basalt—same mesh as above

    20% Antigorite

    20% River Sand"

Geologists testified that pumice might be called a volcanic glass froth so permeated by vesicles of various sizes down to microscopic sizes as to render the mass in many instances light enough to float in water, and that vesicular basalt possessed the same sort of vesicles but was generally heavier than pumice; that the chief use of pumice was as an abrasive. Antigorite was defined as a laminated stone.

Appellants contended that under the contract they were entitled to purchase pumice from the subject land which had been selectively mined so as to be free from any other substance such as the nonpumiceous lavas and the cementing material above referred to; that Basalt was obligated to so purify and process the material in the deposit as to produce a first quality pure pumice with like requirements as to the vesicular basalt from Basalt's own land and that it was further obligated to furnish to them at the contract price the materials referred to in the formula "selectively mined, mixed and dried all at its cost and expense." The issue as to drying arose because it appeared that in the natural state the material in the deposits contained a great deal of water which appellants contended must be eliminated.

With respect to the salient features of the contract the trial court found that the parties intended to agree and did agree that appellants could purchase under said contract materials of the sizes and grades specified "of the same quality and with the same degree or percentage of purity as may from time to time be produced by Basalt Rock Company for its own purposes and by its own customary processes" from the deposits referred to and that particularly the products from the King deposit with respect to the content of pumice therein should have "at least the degree or percentage of purity prevailing generally in said deposit"; that respondent was not required by the contract to selectively mine the material from the deposit so that the pumice would be free from igneous rock and other foreign matters, but that it should furnish the materials in the deposit produced and processed by it in its usual manner; that as to the vesicular basalt called for appellants were

not entitled to receive pure vesicular basalt rock but were entitled to have it processed and delivered to them from the respondent's deposit referred to in the contract as it was found in nature in that deposit.

We think the foregoing interpretations were reasonable and are supported by the evidence. Thus it was shown and the court found, although upon conflicting evidence, that it was when the contract was made and had been at all times thereafter commercially impossible to selectively mine the material in either deposit as demanded by appellants so as to produce either pure pumice or pure vesicular basalt; that Davis was thoroughly familiar with the characteristics of the King deposit; that it was shown that with respect to the water the deposits in their natural state by reason of their physical structure, principally the capillary nature of the vesicles contained in the material, were extremely wet and that it was commercially impossible to dry the same and in fact that such processing as was practicable in producing material of the mesh required necessitated washing, that is, handling by a wet process rather than a dry process; that such processing as was adopted by respondent was best adapted to remove impurities and produced as good a material as could be practically produced from the property. Also upon this matter of the purity of the pumice the court had the benefit of the acts of the parties through the years before any dispute arose. During this period Davis, who alone placed orders for material did not complain that the material from the King deposit processed, as the court found was intended, did not meet the contract requirements. Having in mind the rules of construction, we think the interpretation now being discussed is sufficiently supported by the language of the contract and the foregoing evidence to be binding here. We have not attempted to state all of the testimony upon which the court undoubtedly relied in arriving at its conclusions, but when the situation of the parties, as we have stated it from the record and the evidence adverted to are all considered the court, we think, arrived at a reasonable construction.

Contrary to the contentions of appellants, the trial court found, with respect to price, that appellants were entitled to buy pumice and vesicular basalt at the contract price of $2.50 per ton, provided they were bought in a blend of the ingredients stated in the formula, and provided that the formula ingredients, other than pumice and vesicular basalt, be supplied by appellants to be mixed by respondent, the mixing,

however, to be at appellants' cost and with machinery supplied by them. Appellants contended upon this matter that they were entitled to buy pure pumice at $2.50 per ton, pure vesicular basalt at the same price and that the additional formula ingredients, if demanded by them, must be furnished by respondent thoroughly mixed and blended at its cost. The trial court, as appears from its memorandum opinion, reasoned that the statement in the contract that the price was "based on a blend of pumicite and vesicular basalt in accordance with the formula" meant that the stated price was not the price of the finished blend with all materials and processing to be furnished and done by respondent, but was the price of the pumice and of the vesicular basalt. The contract, as hereinbefore quoted, specifically bound respondent to sell to appellants amounts of pumicite and vesicular basalt required by them and that the price to be paid was $2.50 per ton. Then the contract proceeded to place a limitation upon the foregoing language by providing that "this price is based on a blend of Pumicite and Vesicular Basalt in accordance with the formula attached hereto." When all of the language concerning what is agreed to be sold and the price therefor is considered, along with the evidence as to the circumstances and the conditions attending the execution of the contract, we think the court's interpretation finds adequate support. It was known that a formula would be attached to the contract which might call for whatever admixtures, in addition to pumice and vesicular basalt, the appellants might require, and it would be unreasonable to suppose that respondent, when it executed the contract, was agreeing that this formula could or would contain any additions to materials which it was specifically agreeing to furnish, however great the cost thereof and however great the proportion thereof to other materials required by the formula. In effect, appellants contend that at that moment respondent signed a blank check to be filled in by appellants, and appellants' attorney, who testified as to the discussions that took place when the contract was being negotiated, took the advanced and bold position at the trial by way, we think, of illustration that this formula could have been written so that instead of 20 per cent antigorite it might have called for 20 per cent of gold dust, all to be furnished, mixed and blended at the cost of respondent. It appeared that no one had discussed just what these admixtures would be as per formula; that antigorite was unknown as an element of plaster mix; that no one was in the business of supplying

it for any purpose; that even appellants were at that time uncertain as to what admixtures they would require; and it is reasonable, therefore, to conclude that the parties were so contracting that appellants might call for any additional ingredients they might please, but such additional ingredients were to be furnished by them and mixed and blended at their cost and expense with the materials, that is, the pumice and vesicular basalt, specifically agreed to be furnished and sold to them by respondent.

The trial court construed the contract as fixing the price only for the pumice and the vesicular basalt when sold in the admixture specified in the formula or within the permitted variations from that formula and further declared that the contract specified no price for either pumice or vesicular basalt if purchased without the addition of river sand and antigorite as stated in the formula. What has heretofore been said applies to this conclusion of the court and we think the construction was both reasonable and supported by the evidence and the inferences permissible therefrom. The contract expressly states that the price of $2.50 per ton for pumice and vesicular basalt, which the respondent agrees to sell, is based on the blend set forth in the formula, which is to say that it is confined thereto. Purchases of pumice and basalt otherwise made would have to be paid for at the reasonable market price at the time of purchase.

The appellants contend that under the contract they are entitled to have the material purchased by them delivered to them in such containers, sacks or packages as they desire and furnish for that purpose, and in line with this contention it appears that orders had been received that some material be delivered in one pound packages. The trial court found that they were entitled to have deliveries made in such containers as were customarily used at the time the contract was made, and from the evidence found that these containers were generally cloth, burlap or gunny sacks containing 80 to 100 pounds each. The construction contended for by appellants is unreasonable and we think the one made by the court is both reasonable and in accordance with the evidence.

The trial court found that the contract had not to any extent been assigned to appellant Schwartz and further that it was not assignable. Schwartz was one of the plaintiffs before the trial court and is one of the appellants here. Some time before the action was brought he and J. E. Davis, now deceased, entered into a contract which appellants now claim

to have been an assignment. It does not in express language purport to be such and the trial court found that it was not. On the contrary, it purports to give to Schwartz the right to purchase under the contract any materials which Davis was thereby authorized to purchase. This right was agreed to be conditioned upon the payment by Schwartz to Davis of sums of money from time to time as he made purchases, equal to 40 per cent of payments made by him or his customers to respondent. We think the trial court correctly held that this was not an assignment. Respondent had agreed to sell the material to Soule and Davis. To permit them to bind the respondent to sell to others upon the same terms would make the contract unduly burdensome. For instance, there was the right on the part of Soule and Davis to vary the formula within certain limits whenever they placed an order. It is easy to see what would happen to respondent if they in turn would authorize a thousand customers of theirs to order material, each one wanting a different formula followed. The trial court correctly held that Schwartz did not obtain by reason of the contract between himself and Davis any right to compel respondent to sell or deliver material to him.

The trial court further held that the contract was of such nature that it was not assignable, notwithstanding it contained a clause stating that it should ''inure to the benefit of and be binding upon the heirs, administrators, executors, successors and assigns of all the parties hereto.'' Generally, unless by law or contract prohibited, contracts are assignable. But whether they are or not is to be determined by consideration of the contract and the various obligations and rights of the parties thereto. This inquiry is not foreclosed as a matter of law by a recital of assignability such as is contained in the contract before us. As was said in *Montgomery* v. *De Picot*, 153 Cal. 509 [96 P. 305, 126 Am.St.Rep. 84], where the agreement was for a conveyance by defendant therein of property to the second party to the contracts whose assignee the plaintiff was:

''These, however, are general provisions of the contract and are not conclusive upon the subject of assignability. The use of such language in a contract is not in every case absolutely determinative of its character. . . . Notwithstanding its use the intention of the parties must be gathered from a consideration of the terms and entire tenor of the contract and if upon such consideration it appears that the contract calls for the performance of an obligation purely personal in its

nature, the rule in general is that the obligation, if personal, cannot be assigned without the consent of the party to be benefited.''

We think the trial court correctly reasoned that under the peculiar provisions of this contract and in view of the unusual conditions that existed when it was executed it was never the intention of any of the parties that respondent should be burdened by having to perform it with any one other than the parties with whom it made it. We have referred to some of these conditions and will not restate them here. Additionally it was shown by the evidence that when the contract was made Soule and Davis believed that they would be able, through perfecting a formula not then perfected, to establish a business of selling a lightweight plaster mix. The idea was not a new one; a number of others had attempted to accomplish this with no general success. There was grave doubt as to whether it could be achieved and particularly was there grave doubt as to whether it could be done with the pumiceous material contained in the King deposit. Respondent might well be willing to go along with Soule and Davis, permitting them to change their formula as experience might dictate in the effort to produce a better mix, but this they might well be unwilling to do with successors by assignment. As the trial court said:

''The reading of it indicates that it was not intended to create anything more than a personal obligation to Soule and Davis. Fundamentally it is based upon the personal requirements of these parties in the use of Pumicite in the plastering field. The terms of the agreement itself demonstrate that the burden of meeting the demands of Soule and Davis would be one kind of a burden upon the defendant, and that the demands and requirements of multitudinous assignees with other purposes in view would be quite another. That such was not intended to be contracted for by the defendant is obvious. The variations in the formula permitted by the contract are so wide that about the only controlling factor was the extent and character of the plastering business of Davis and Soule. The defendant was definitely willing to meet the requirements of this business, but it just as definitely appears that it did not intend to obligate itself to meet the requirements and demands of anyone whom Davis and Soule might select. The requirements of the latter might be such as to compel the defendant to devote its entire resources to this end to the exclusion of its own business, making out of

itself an adjunct of the assignee. No such intention can be read into the contract.''

There are also provisions in the contract for the extension of credit to Soule and Davis in that they are permitted to buy and pay on the 10th of the month following delivery; also permitting them to make such changes in their formula as they desired, provided that any machinery for producing it especially required by reason of such changes in formula would be supplied by them. We think it clear that the inter-relations set up by this contract were such that the court was fully justified in declaring that the contract was personal and was not assignable.

The other issues tendered by the pleadings depended in the main part upon the correctness of the trial court's interpretation of the contract and with that interpretation in mind the trial court found that respondent had not been guilty of breaching the contract and that, therefore, appellants were not entitled to damages as prayed for, that the consideration of the contract had not failed and that therefore appellants were not, as claimed, entitled to have the property declared to be held in trust for their benefit by respondent. These findings are supported by the construction of the contract and also by testimony that the respondent had lived up to its obligations as so construed.

We think that the court properly disposed of the issues presented and that the judgment ought to be and it is hereby affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied December 4, 1951, and appellants' petition for a hearing by the Supreme Court was denied January 3, 1952. Carter, J., voted for a hearing.