[S. F. No. 15659. In Bank.—August 19, 1938.]

NAIM E. ZEIBAK, Plaintiff and Appellant, v. WILLIAM N. NASSER et al., Defendants and Appellants.

Sullivan, Roche & Johnson, Walter H. Linforth and William M. Cannon for Plaintiff and Appellant.

Nat Schmulowitz, George B. Harris, Gavin McNab, Schmulowitz, Wyman, Aikins & Brune for Defendants and Appellants.

THE COURT.—Plaintiff brought this action for dissolution of a partnership or joint venture, theretofore entered into between him and defendants, for an accounting, and if necessary, a sale of the partnership property.

The pertinent facts involved herein are summarized as follows: On or about December 12, 1931, and prior to January 11, 1932, plaintiff and defendants William N. Nasser, Elias Nasser, L. G. Dolliver and Central California Theatres Company (a corporation, organized and owned by seven Nasser brothers, among whom were William and Elias), entered into an oral agreement whereby they contracted to become joint venturers in the acquisition of a certain theatre business, consisting of the ownership and leasehold interest of the New Fillmore Theatre, the New Mission Theatre and the American Theatre, all of which were then owned by the Estate of Greenfield and located in the city of San Francisco. On January 11, 1932, the members of the venture submitted a written offer to purchase the business, and agreed therein to assume an outstanding indebtedness of the business, and also obligated themselves therein to expend certain sums of money thereafter and within specified times, as and for the repair and alteration of each theatre respectively. This offer was accepted by the estate, subject to the approval of the probate court. The parties further agreed that should they acquire the said theatres, immediately thereafter they would form a corporation under the laws of the state of California to take over the management and operation of the said theatres; that plaintiff would own an undivided one-half interest, Dolliver a 20 per cent interest, and the remaining defendants, jointly, a 30 per cent interest in the corporation; and that each of the parties would contribute his respective share of funds, if such were found to be necessary, for the maintenance and operation of the said theatres.

On January 28, 1932, the plaintiff and the defendants, other than Dolliver, entered into a written agreement entitled "Memorandum of Understanding Reached and to be Reached", wherein it was provided in part, that, "The General Management and Administration of the corporation, . . . the scope of which shall be determined at this time to include management and supervision of the said Greenfield Houses and all activities directly and indirectly pertaining thereto,

shall be entrusted to the Nassers, and their compensation for all of said services shall be fixed upon the basis charged to their subsidiaries for like services. . . . Definite understanding shall also be had concerning the manner of and check upon the disbursement of funds, general policies, and the manner and extent to which Zeibak shall participate in the joint operation of the business of the corporation, subject however, to the primary general management and administration by the Nassers . . . it being understood that when all details are finally ascertained, formal agreements evidencing the understandings between the parties shall be executed. . . . '' On the day following, Dolliver and the other defendants entered into a written agreement whereby Dolliver agreed that the exclusive management and control of the business should be lodged in the Nassers, and thereafter Dolliver appears to have assumed the status of a mere investor in the enterprise.

On February 1, 1932, the probate court having approved the sale of the Greenfield interest in the leaseholds and the business, the agreement of purchase was executed by the parties thereto. The amount of the initial payment, to wit, the sum of $50,000 was paid in equal parts by plaintiff on the one hand and the defendants on the other. Thereupon the venture entered upon the operation and management of said theatres. Each of two of the Nasser brothers, other than William and Elias, was given a position as theatre manager of one of the theatres thus purchased. The Nasser brothers also owned other theatres in the city of San Francisco, and the management of the three theatres thus acquired by the venture, was carried on by them in the offices used by Nasser brothers for the management and operation of the other theatres independently owned by them.

Shortly after the business was taken over by the venture, differences arose between plaintiff and the defendants Nasser with regard to the conduct of the business and the respective rights of the parties under the joint venture agreement. These differences continued practically from the date of purchase of the business to the time of the filing of the complaint. No corporation was formed pursuant to the evident intention of the parties, for the reason that the members of the venture could not agree upon certain terms and conditions which respectively they desired to set forth in the supple-

mental agreement contemplated by the terms of the agreement of January 28, 1932, above referred to. Numerous proposals and counter proposals were offered by the parties, each to the other, during this period of time, relating to the terms and conditions each sought to have incorporated in the said supplemental agreement. The parties could not agree, however, upon any certain draft of agreement submitted by plaintiff on the one hand, or by the Nassers on the other, with the exception of one certain draft of agreement, hereinafter mentioned, which was signed by plaintiff on or about October 3, 1932, and by the defendants on or about November 25, 1932, but the executed copies of which were never interchanged by the parties. Despite the lack of harmonious relationship between or among the members of the venture during this period of time, the record shows that the business (which had been operating at a substantial loss under its prior management) flourished to a marked degree, and that a very considerable profit was realized by the venture from the operation of the said business.

Plaintiff's action was founded upon the principal claim that the defendants had wrongfully taken exclusive possession and charge of the business against his will and without his consent, and had wrongfully excluded him therefrom; and particularly, that they had denied him access to the books of the corporation and had refused to give him sufficient information as to the details of the business to enable him to determine its condition sufficient to protect his interest therein; also that large amounts of money monthly had been paid by the venture as salaries to defendants' relatives, without adequate services having been rendered to the venture by such persons. The defendants, however, by way of affirmative relief, and upon the contention that plaintiff had caused the dissolution of the business wrongfully, asked that they be permitted to continue the business upon payment to plaintiff of the value of his interest therein, as contemplated by the provisions of section 2432, Civil Code. As the basis for this request they contended that plaintiff had refused to cooperate with them in the matter of carrying on the partnership business; that he had refused to comply with certain terms of the joint venture agreement and that contrary to the provisions thereof he had asserted rights and demands on his part not contemplated by the terms of said agreement.

During the course of a long trial, on the issues thus presented, defendant L. G. Dolliver died. With the permission of the probate court so to do, Marie Dolliver, his widow and special administratrix of his estate was thereafter substituted as a defendant in the action in the place of her deceased husband. At this time counsel for plaintiff, by motion, asked the court to enter an interlocutory decree of dissolution and to proceed with the winding up of the affairs of the joint venture upon the ground that the death of Dolliver *ipso facto* had dissolved the said joint venture. The court denied this motion and proceeded to hear the evidence in the case.

On July 20, 1934, the court made a minute order by which the joint venture was declared dissolved, and therein provided for the appointment of appraisers to appraise the property. It was further ordered that the defendants pay plaintiff the value of his one-half interest and indemnify him against all present and future liabilities; that the business thereafter should be conducted by defendants, including Marie Dolliver, during the remainder of the period of the leases; that an accounting be had and that the profits be divided between plaintiff and defendants. Thereafter it was further ordered that the appraisement be made as of the date December 11, 1932, as well as of July 20, 1934, and that neither of such appraisals should include the good will of the business. The final judgment was in accordance with these orders and recited that the dissolution of the joint venture occurred on July 20, 1934, ''plaintiff having wrongfully caused the same by his conduct''.

The parties hereto have filed cross-appeals. Defendants appeal from portions of the final judgment only. Plaintiff appeals from the whole thereof, and has also made a motion to dismiss defendants' appeal.

Each of the parties advances several asserted reasons why the judgment should be reversed or modified in accordance with his or their respective views, but the principal question before this court relates to the question of the sufficiency of the evidence to support the findings, which were favorable to the defendants in all material respects.

Plaintiff's first contention is that the evidence was insufficient to support the findings relating to the alleged wrongful conduct of plaintiff. These findings are substan-

tially as follows: that during the period of negotiations following the acquisition of the theatres and while the parties were endeavoring to arrive at "definite understandings" prior to the organization of the proposed corporation, there was finally reached a point when a document purporting to be an agreement between or among the parties (and which had been signed by plaintiff prior thereto) was signed by defendants on November 25, but that "when the time arrived for the interchange of said agreement between the plaintiff and the defendants, the said plaintiff on or about December 11, 1932, failed, refused and neglected to deliver" the copy so signed by him, and has since refused to do so; and that "at all times since on or about December 11, 1932, in contravention of the terms of the agreements and understandings reached between December 12, 1931, and January 11, 1932, and in contravention of the terms and conditions of the agreement of January 28, 1932, the said plaintiff has wilfully and persistently failed and refused to proceed with the performance thereunder, but on the contrary . . . has wilfully and persistently repudiated the aforementioned agreements and understandings" and has sought to revise the said agreements and understandings and to negotiate new terms and conditions under which the theatres should be maintained and supervised; and that "said plaintiff has been guilty of such conduct as has tended to affect prejudicially the carrying on of the business and has otherwise so conducted himself in matters relating to the partnership business that it is not reasonably practicable for the defendants to carry on the business in partnership with the plaintiff".

The record discloses the fact that the evidence was amply sufficient to support these findings, notwithstanding it was conflicting in some respects. With regard to the incident of December 11th, referred to in said finding, the evidence showed that on or about October 3, 1932, plaintiff signed a proposed final agreement, to the provisions of which all of the partners had orally agreed. Thereafter, however, and before the defendants executed a duplicate copy thereof, they proposed the addition of another paragraph, to the provisions of which plaintiff objected. Disputes thereupon arose between the respective parties relative to this paragraph and other matters, which resulted in the defendants' withdrawal of the offending paragraph from the agreement, thus rendering the document

free from the objections raised by plaintiff thereto. A copy of the agreement thus restored to its original status, to which all the parties had agreed was then signed by the defendants on or about November 25, 1932, and on or about December 11, 1932, as recited in the findings, plaintiff refused to exchange the copies of the agreement executed by the respective parties. Considering the fact that had he done so his action would have removed the obstacle to the formation of a corporation, an object which all the parties had originally intended to carry out, his failure to do so, after the objectionable matter had been removed from the agreement was at least a violation of the duty he owed his fellow partners of cooperating with them to effectuate the purposes for which all had joined. The evidence also showed that plaintiff had refused to pay his proportionate share of a deficit incurred by the venture in 1932; and that he had failed to join the other members of the venture in the execution of plans for repairs and alterations to be made to the New Fillmore Theatre within the time agreed upon by them in their offer of purchase to the Greenfield estate. The court also found that "Defendants have at no time refused to give to the plaintiff sufficient or any information as to the details of the business so that he would be enabled to determine the condition thereof and protect his investment therein, but on the contrary the defendants have at all times supplied to the plaintiff all information which is available to the defendants themselves concerning the details of the business." In this regard the evidence showed that the venture had employed a firm of certified public accountants, which at regular intervals had audited the books, and that copies of such audits had been delivered to plaintiff; that in addition thereto he had made copious notes from the books and other memoranda relative to the business; that he was permitted to and did make frequent inspection of the books and records of the venture. The bookkeeper employed by the venture testified that the defendants had instructed her to give to plaintiff any and all information he might ask for relative to the business, and that she had complied therewith. The court further found that the defendants had been given the right, under the agreements of the parties, to the general management, administration and supervision of all activities pertaining to the theatres and to receive as and for their compensation a sum equal to the

amounts charged to their subsidiaries for like services. These findings are likewise fully supported by the evidence. The testimony of George Nasser was, in part, as follows: that he and his brothers had been negotiating for the Greenfield theatres before anything was said to them about plaintiff's wishing to join them in their acquisition; that plaintiff wanted a fifty per cent interest; that "We did not want to give him that at first, but we gave it to him because there was no quarrel about him giving us the management and administration"; that "We told Mr. Zeibak that I would be the manager of one of the theatres and that James (Nasser) would be the manager of one of the other theatres"; that plaintiff was told the salary of house manager would be $100 a week, which would be the amount James and (the witness) would receive for such services; that plaintiff made no objection or protest whatever when told of this arrangement; that "about a week after we decided on Mr. Zeibak's participation I took him to the three theatres . . . told him what was necessary in the nature of changes", but that after the purchase of the property, and on May 27, 1932, when an estimator of costs for repairs to the New Fillmore Theatre came out and brought a sketch with the itemized cost of different changes from the present structure, "We discussed the plan with Mr. Zeibak . . . " and that the latter "had taken the position that unless certain demands were met, he would not put up a dime, and had so stated to us" and that the plan was stopped, notwithstanding the fact that the Nassers wanted "to proceed with the proposed repairs and remodelings on both the New Fillmore and New Mission theatres" and told plaintiff that many times. It was also shown that within one week after the defendants had taken over the management of the three theatres plaintiff made the demand that he be installed as manager of one of the theatres at a salary of $100 a week; that the defendants refused this demand because of the fact that plaintiff had had no experience in managing a theatre, and that in their opinion he was not qualified to do so. It was further shown that George and James Nasser were experienced in this branch of the theatre business; that one of them had resigned from a position as manager of a theatre outside San Francisco at a salary of $100 a week to take over the management of the New Fillmore Theatre at the time of its acquisition by the venture, and that the salary paid by

the venture for the position of theatre manager was comparable to that paid by other theatre owners for like services. The evidence further showed that the Nasser brothers had had wide experience in the motion picture field for many years prior to the acquisition of the theatres concerned in this action and that their reason for desiring the management of these theatres was because they believed that due to their knowledge and experience in this particular industry they could put these theatres back upon a paying basis, an object which was subsequently accomplished.

Plaintiff also contends that section 2432, Civil Code, was erroneously applied to the facts of this case because, he asserts, that section relates to partnerships only, and not to joint ventures. That section provides as follows:

" . . . (2) When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows:

" (a) Each partner who has not caused dissolution wrongfully shall have:

" . . . II. The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

" (b) The partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership and for that purpose may possess the partnership property; provided, they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under clause (2aII) of this section, and in like manner indemnify him against all present or future partnership liabilities.

" (c) A partner who has caused the dissolution wrongfully shall have:

" . . . II. If the business is continued under paragraph (2b) of this section the right as against his copartners and all claiming through them in respect of their interests in the partnership, to have the value of his interest in the partnership, less any damages caused to his copartners by the dissolution, ascertained and paid to him in cash, or the payment secured by bond approved by the court, and to be released

from all existing liabilities of the partnership; but in ascertaining the value of the partner's interest the value of the good will of the business shall not be considered.''

Plaintiff's contention that this section was not intended to apply to joint venture agreements, of the nature of the one in question here, cannot be upheld. The rule is that the rights and liabilities of joint adventurers, as between themselves, are governed by the same principles which apply to a partnership. (*Lerner* v. *Sanderson*, 126 Cal. App. 481 [14 Pac. (2d) 564], *Ford & McNamara, Inc.*, v. *Wilson*, 119 Cal. App. 475 [6 Pac. (2d) 996], *Arnold* v. *Humphreys*, 138 Cal. App. 637 [33 Pac. (2d) 67], *Elliott* v. *Murphy Timber Co.*, 117 Or. 387 [244 Pac. 91, 48 A. L. R. 1043], and *Keiswetter* v. *Rubenstein*, 235 Mich. 36 [209 N. W. 154, 48 A. L. R. 1049].)

Nor is the claim to be upheld that section 2432, Civil Code, is inapplicable to the situation here presented because it contemplates a partnership for a fixed term, whereas the joint venture agreement here involved failed to specify a certain length of time for its duration. Notwithstanding the fact that the trial court found the venture was not entered into for any specific period of time, but was to end, in so far as it was legally possible for it to end, upon the formation of a corporation, this was never done, and the parties voluntarily continued their status as joint venturers under the oral agreements between themselves, and those entered into by them with the Greenfield estate. The following authorities illustrate the rule that where a joint venture or partnership has leased property for the purpose of carrying on a particular business and no fixed period is set for the duration of the partnership, it will be deemed, by implication, to continue during the term of such lease. In the case of *Zimmerman* v. *Harding*, 227 U. S. 489 [33 Sup. Ct. 387, 57 L. Ed. 608], two persons entered into a partnership to operate a' hotel under a lease. The agreement was never reduced to writing and there was no stipulation as to its duration. After the parties had taken possession difficulties arose between them, which resulted in an attempted dissolution of the partnership by one of the partners. There the court said, '' . . . We agree with the court below that although there was no express stipulation as to the duration of the partnership agreement, it was by implication to con-

tinue during the term of the lease of the hotel property."
Also, in the case of *Beller* v. *Murphy*, 139 Mo. App. 663
[123 S. W. 1029], wherein certain persons had agreed as
partners to conduct a mining business on land leased by them,
and the question later arose as to whether it was a partner-
ship for a fixed period or merely a general partnership with
no time fixed for its duration, the court said, "The purpose
of this partnership was to conduct a mining business upon
the land leased, and the partners must have understood that
the business was to continue during the life of the lease, and
this made it a partnership contract for a definite period,
towit, ten years."

Plaintiff further contends that, assuming the applica-
tion of section 2432, Civil Code, to joint ventures, it does not
apply here because the venture was one which could have
been lawfully dissolved by the "express will" of a member
thereof, under section 2425 (b), Civil Code. This section
reads as follows: "Dissolution is caused: . . . (b) By the
express will of any partner when no definite term or par-
ticular undertaking is specified, . . ." This contention like-
wise cannot be upheld for the reason that the venture here
was not one which could have been lawfully dissolved by
the *express will* of a member thereof. Here there was a
definite, and "particular undertaking", voluntarily assumed
by each of the partners, and as hereinabove stated, the term
of the venture, at least impliedly, was of similar duration
as the term of the leases under which the theatres were
operated. In the case of *Bates* v. *McTammany*, 10 Cal.
(2d) 697 [76 Pac. (2d) 513], this claim was also made.
There the court found that the partnership was formed for
the purpose of conducting a radio station "so long as the
license therefor could be obtained from the federal govern-
ment". The defendant contended that the partnership was
one at will and that he was entitled to a dissolution under
certain sections of the Civil Code, including section 2425 (b).
The court there said, "The finding that the partnership was
formed for a definite undertaking . . . and so long as the
federal license therefor could be procured, is fully supported
by the record, and negatives any conclusion which otherwise
might be drawn that the partnership was one at will."

Plaintiff has advanced other asserted reasons why
section 2432, Civil Code, should not be considered applicable

to the facts of the instant case—based upon the contention that that section only contemplates a dissolution *by a partner* and not by decree of court under the provisions of sections 2425 and 2426, Civil Code. Section 2432, Civil Code, provides that, ''When dissolution is caused in contravention of the partnership agreement'' the rights of the partners shall be as follows: '' . . . A partner who has caused the dissolution wrongfully shall have,'' etc. Although the actual dissolution in the instant case was effected by the decree of court, nevertheless such dissolution was caused by the wrongful conduct of plaintiff ''in contravention of the partnership agreement'', as is clearly contemplated by the provisions of section 2432, Civil Code. That section provides the rights and remedies of both the offending and nonoffending partners where, as here, a dissolution has been effected because of the wrongful conduct of one of the partners. There is no language to be found in that section which expressly or impliedly precludes its application to the facts of the instant case, where it was found that not only had plaintiff's conduct been ''in contravention of the partnership agreement'', but that the court had decreed the dissolution because of such wrongful conduct.

 Defendants and cross-appellants contend that the court erred in fixing the date July 20, 1934, as the date upon which the value of plaintiff's interest should be determined because of certain language contained in finding number nineteen which indicates, they assert, that the dissolution was caused by plaintiff on December 11, 1932, and hence that his interest must be determined as of that date. This finding is as follows: '' . . . by reason of the wilful and persistent failure and refusal on the part of the plaintiff to proceed with the performance of his agreements and understandings with the defendants entered into on and prior to January 11, 1932, and on January 28, 1932, and *by reason of the conduct of the plaintiff on or about December 11, 1932,* as hereinbefore found, *by virtue of which said conduct the said plaintiff caused the wrongful dissolution of the venture* in which the plaintiff and the defendants engaged, and by the aforesaid conduct the said plaintiff has been guilty of such conduct as tends to affect prejudicially the carrying on of the business of said venture, and further by reason thereof the court finds that it is not reasonably practicable for the

defendants to carry on the business in partnership with the plaintiff, and there being other circumstances as hereinbefore found and as established by the evidence which renders a dissolution between the parties in the aforementioned venture equitable, the court hereby further specifically finds that the defendants in the above entitled action have not caused the dissolution of said venture wrongfully and that the said plaintiff has caused the dissolution of said venture wrongfully''. (Italics ours.) Although the words in this finding, ''and by reason of the conduct of the plaintiff on or about December 11, 1932, as hereinbefore found, by virtue of which said conduct the said plaintiff caused the wrongful dissolution of the venture'', considered separately might be said to support defendants' contention, nevertheless, under rules relating to the interpretation of findings, certain language may not be isolated from the entire context, where to do so would place an interpretation upon such finding different from that which would follow from a reading of the finding as a whole. The finding in question here is expressed in the conjunctive and clearly indicates, when read in its entirety, that the trial court meant that the plaintiff, by a course of conduct upon different occasions, prior to December 11, 1932, as well as upon that date, had rendered a dissolution by the court equitable, and not, as defendants contend, that the court considered that by his conduct on December 11, 1932, plaintiff had caused a dissolution *ipso facto* as of that date. The court stated that it intended no such meaning as is contended for by defendants to be given to this finding, when, in replying to an argument of defendants' counsel relative to this contention, it made the following remark: ''I will say to you very frankly that unless I am convinced that in fixing the date of July 20, that the court is not correct, why of course, I would not want any other proof except the proof which is before me; and my order was made in that respect upon the theory that no matter what these gentlemen did, that the actual dissolution did not take place until the court made its order dissolving the partnership, and that is why I fixed the date as July 20, 1934. Now I may be wrong upon that theory but I included the other date (December 11, 1932) at your (defendants') instance, . . . because of the fact that it was upon that date that the court construes that the (partnership) contract was actually breached . . . that

is, that was the date when Mr. Zeibak notified your clients that he would not go through with the contract after they had notified him that the contract, which finally they might all have agreed upon, that they had agreed to; as I say, it is wholly upon that theory that the court has fixed in its own mind that the valuation of the property should be made as of the date which the court actually dissolved the enterprise, and unless I am wrong in that respect why I think I shall adhere to that date." Although this finding might well have been more clearly phrased, any apparent ambiguity therein is completely dispelled by the words of the trial court just referred to. Throughout the findings, conclusions of law, and into the final judgment the trial court consistently adhered to the date July 20, 1934, as the date upon which plaintiff's interest should be ascertained. Furthermore, it may be said that after December 11, 1932, the acts and conduct of the defendants were wholly inconsistent with a recognition upon their part that they considered the venture had been dissolved *ipso facto* as of that date. Notwithstanding the fact that on one occasion the defendants informed plaintiff that they considered he had breached the partnership agreement by his failure to sign the agreement upon that day, up to the date of trial, the parties continually negotiated, each with the other, looking to a settlement of their differences, and during the entire time, to all intents and purposes they resumed and continued the partnership relation. In the case of *Beller* v. *Murphy*, 139 Mo. App. 663 [123 S. W. 1029], the claim was also made that the wrongful conduct of some of the partners in excluding one partner from the business of the firm caused a dissolution of the partnership *ipso facto*. In negativing this contention the court said, "In the case of *Hartman* v. *Woehr*, 18 N. J. Eq. 383, it was said, 'If part of the capital of an agreed partnership has been paid, accepted, and used, and the business has been commenced in the name of the firm, he is an actual partner until the partnership is legally dissolved, and a mere exclusion of such person by the others from the business of the firm by illegal acts on their part is not a legal dissolution, but is a ground for an application to a court of equity for a dissolution upon his part, and, until such dissolution is had, he is entitled on an accounting, to his share of the profits.'" Also, in the case of *Carrey* v. *Haun*, 111 Or.

586 [227 Pac. 315], it was held that a partner who was wrongfully excluded from control of the partnership property, was not entitled to an accounting as of the date of such wrongful exclusion, so as to avoid his share of loss, subsequently occurring, where he then took no steps to dissolve the partnership and obtain an accounting. The court said, "Even if we consider the dissolution of the partnership to have occurred on April 6, 1922, yet it remains in force for the purpose of winding up its affairs, . . . The dissolution, whenever occurring, did not change the interest of either partner in the property of the firm until the final closing up of its affairs."

■ Plaintiff also makes the claim that the death of L. G. Dolliver worked a dissolution of the partnership. We cannot concur in this view. Here the parties themselves had by their several agreements and undertakings created a situation wherein the death of Dolliver could not defeat the obligations voluntarily assumed by him and his copartners. In the case of *Beller* v. *Murphy,* 139 Mo. App. 663 [123 S. W. 1029], hereinbefore referred to, one of the partners died before the expiration of the term of the lease and it was there contended that his death had dissolved the partnership. The court said: "As a general proposition the death of one partner does dissolve the partnership; but, even in those cases, the dissolution caused by death does not affect existing contracts. (30 Cyc. 620; *Hughes* v. *Gross,* 166 Mass. 61 [43 N. E. 1031, 32 L. R. A. 620, 55 Am. St. Rep. 375].) Since this partnership had contracted to mine this land and pay royalties for ten years, its contract must be fulfilled." Here also, as above noted, Dolliver had but a twenty per cent interest in the business, and immediately upon his entry into the venture, he assumed the status of an investor, and took no active part in the affairs of the partnership. In the case of *Schenk* v. *Lewis,* 125 S. C. 228 [118 S. E. 631], the court, in considering the effect of the death of a partner stated that "While it is true, as a general rule, that the death of a partner effects an immediate dissolution of the partnership, it is not always so. If there was any special skill or capacity in the deceased partner, the partnership would, of course, cease to exist from the time of his death. But if the business was for the purpose of keeping the dead partner's capital invested in the partnership, there

is no reason why his death would necessarily terminate the relation. (2 Story Eq. Jur. [14th ed.], sec. 916.) In this particular case the small interest of Lewis in the partnership does not indicate any special skill or capacity; and the course of dealing suggests the purpose of keeping his capital invested, in which event the Lewis estate would be entitled to his share in the profits of the continued business.'' (See, also, 47 C. J., p. 1112.)

Plaintiff also contends that the application of section 2432 Civil Code to the facts of this case, under which section he was denied one-half the value of the good will, was a taking of his property without due process of law,—and further that this section provides for ''double penalties'' in making provision for the assessment of damages against an offending partner in addition to denying him any portion of the good will of the business. This view disregards the fact that the code section is purely remedial in that it provides for a mode of procedure which plaintiff must be deemed to have consented to when he entered into his undertakings with defendants. Plaintiff was afforded the right to have his cause tried and determined under the same rules of procedure that are applied to similar actions brought pursuant to the Uniform Partnership Law (Stats. 1929, p. 1896). This right having been accorded him, when considered together with the fact that he invoked the process of the law himself, precludes him now from asserting that his property was taken from him without due process of law, under the provisions of the Uniform Partnership Act, as adopted by this state. In the case of *Gray* v. *Hall*, 203 Cal. 306 [265 Pac. 246], it was said, ''It is the right of a litigant to have his cause tried and determined under the same rules of procedure that are applied to other similar cases, and when this is afforded to him he has no ground to complain that due process of law is not being observed.'' (See, also, 5 Cal. Jur., p. 864.) In the case of *Dow* v. *Beals*, 149 Misc. 631 [268 N. Y. Supp. 425], which was an action for dissolution of a partnership, and which involved the construction of a section in all material respects similar to that of section 2432 Civil Code, in discussing the constitutionality of this section the court said: ''Such power to dispense with a judicial sale is given by the provisions of the partnership law, . . . The portions of these sections referring to the procedure

to be adopted in this action are clearly remedial in character. They do not impair any contract rights, and they fix only the method of procedure. . . . In so fixing value the good will of the business should not be considered.''

Defendants and cross-appellants also contend that the trial court erred in not awarding them damages as prayed for. The trial court found that defendants had failed to show that they had suffered any damages by reason of plaintiff's conduct. The evidence fully supports this finding.

The finding of the trial court with regard to the appraisement is as follows: ''The court finds that the defendants have, in pursuance of the aforementioned interlocutory order . . . rendered to the above entitled court a full and complete accounting of all transactions of the said joint venture, including all profits arising therefrom from the beginning of said venture up to and including the dissolution thereof on July 20, 1934.'' Although both parties to the action have challenged the fairness of the amount found to be the interest of plaintiff on the date of dissolution each claiming in accordance with his respective views, that the amount of certain items of expenditure should have been added to or deducted from the amount found to be the going concern value,—the evidence discloses the fact that a full and fair accounting was had between the parties. The value of the assets as entered upon the books of the venture was shown to have been the basis upon which the value of plaintiff's interest was computed. All three of the appraisers agreed upon a certain sum as representing the value of plaintiff's one-half interest, but two of the appraisers submitted concurring reports in which each arrived at entirely different figures with respect to the ''going concern'' and ''good will'' value, respectively. The question of the valuation of plaintiff's interest was a matter for the trial court, and upon the divergent views thus submitted by the appraisers, the finding of the trial court may not be disturbed. (*Freeman* v. *Donohoe*, 65 Cal. App. 65 [223 Pac. 431]; *Ratto* v. *Ratto*, 206 Cal. 661 [275 Pac. 784]; *McAtee* v. *McAtee*, 105 Cal. App. 555 [288 Pac. 114].)

Defendants and cross-appellants were awarded costs in the action proper, but upon the appraisal proceedings each party was charged with the payment of one-half the appraisers' fee. Defendants contend it was error for the court

to have taxed them for a portion of this fee. This was a matter within the discretion of the trial court, and the action of such tribunal will not be disturbed, where as here, there is no showing of an abuse of discretion.

Judgment affirmed. Motion to dismiss appeal denied.

Rehearing denied.