[Civ. No. 19180. Second Dist., Div. Two. Mar. 11, 1953.]

NICK VANGEL et al., Respondents, v. CHARLES VANGEL, Appellant.

618

Pacht, Tannenbaum & Ross, Isaac Pacht, Clore Warne, Jerry Pacht and Maxwell E. Greenberg for Appellant.

J. Howard Sullivan and Joseph T. Enright for Respondents.

FOX, J.—The parties, who are brothers, entered into a partnership agreement in May, 1944, in contemplation of the purchase of the Cascade Ranch of some 330 acres. Approximately one half thereof consisted of producing orange and lemon groves. Each was to furnish his pro rata share of the down payment. It was provided, however, that in the event one of the group could not otherwise raise his one third of such required payment and one of the other brothers should advance sufficient money to pay the same, the one for whom the advance should be made would execute a promissory note for such amount, bearing interest at a rate to be agreed upon, in favor of the brother who had made the loan. Such note was to be secured by a mortgage or trust deed covering his interest in the property. Any such note, however, was to be paid only out of funds accumulated from the operation of the ranch or realized from its sale. After specifying the order in which the revenues from the ranch should be applied in payment of its operations the agreement finally provided that the balance should be divided equally between the parties,

except that in the event one of the parties advanced a portion of the down payment for one of the others, the amount that would normally be paid to the latter should be paid to the one who made the advance until such loan had been liquidated. Each party agreed to devote his entire time to the operation of the ranch as soon as he liquidated his current business. The parties were to agree from time to time upon a fixed amount to be drawn by each party by way of a drawing account, living expenses or wages.

During the following June the three brothers made a contract with the owners of the Cascade Ranch for its purchase for $340,000, including a down payment of $120,000. Charles did not have available his one third of this amount. As a consequence Nick and Ernest were required to advance $25,000 to him to make up his share of the initial payment. In order to raise the funds it was necessary for Nick and Ernest to sell their restaurant in Los Angeles, which they did in September. Charles, too, was in the restaurant business in Hollywood. Some months prior, however, to this deal he had acquired another but much smaller ranch. Although all the down payment had not been made, Charles, on October 1st, moved onto the ranch where he has since resided.

Because of the lack of experience of the purchasers in the management of citrus properties and because the down payment had not been made in full, a Mr. Culbertson, who had originally planted the citrus groves and managed the ranch for 20 years and who was a representative of the sellers, was employed as manager and adviser until the Vangels completed their down payment in April, 1945.

The parties almost immediately began to have difficulties. Nick and Ernest claimed that Charles usurped the managerial responsibilities excluding them from participating therein. Charles complained because they would not agree upon the amount he should be paid for operating the partnership enterprise. Nick and Ernest insisted that Charles execute a note, together with a mortgage on his interest, to secure the $25,000 they had advanced for him. This he refused to do until they agreed upon his salary. The result was that Nick and Ernest filed this action in April, 1946, for a dissolution of the partnership and for an accounting.

Following a protracted second trial, the court decreed a dissolution as of June 15, 1950, and permitted the parties to participate in the profits of the ranch until January 1, 1951, excluding therefrom, however, expenses for pruning and fer-

tilizing the groves. Charles was found to have wrongfully caused the dissolution. As a consequence the plaintiffs were given the privilege, pursuant to the provisions of section 15038(2b) of the Corporations Code, to purchase defendant's interest. The court found the value of the partnership property to be $235,000 as of the date of dissolution. After making various adjustments in the accounts of the parties the court determined that defendant's total interest in the assets of the partnership was $58,600.25, and plaintiffs were given the privilege of buying Charles' interest for that amount. Defendant appeals from this judgment.

Charles insists he did not prevent plaintiffs from participating in the management of the ranch; that he was not to blame for the dissolution of the partnership; that plaintiffs are not in court with clean hands; and that they should not be permitted to purchase his interest.

The court found that plaintiffs had been prevented by defendant from participating in the management and operation of the ranch and from putting in equal time with defendant in the partnership business although they had been at all times ready, able and willing so to do, and had frequently requested defendant that they be permitted to put their full time and efforts into the operation and conduct of the partnership enterprise. In support of this finding it appears that defendant directed the day-to-day operations of the ranch, determined what work was to be done, when and by whom it would be performed. Charles objected to plaintiffs' going around talking to the employees, and refused to tell Ernest what their duties were. He told Ernest to mind his own business and even threatened him with bodily harm if he interfered with the employees. He said, ''I'm going to run this ranch.''

When Culbertson's services were terminated he gave the parties instructions relative to the operation of the citrus groves. The State Agricultural Inspector also gave advice as to when the trees should be sprayed. Plaintiffs insisted that Charles should carry out these recommendations, but he refused. He told plaintiffs, ''You guys [are] sticking your nose too much in this ranch business. You are nothing but nincompoops.'' He refused to employ any expert or technical services although plaintiffs requested such employment. The foregoing evidence lends support to the court's finding that defendant did not ''permit plaintiffs to participate in the operation and management of said property in relation to the

cultivation, pruning, irrigation, fertilizaton or smudging of the orchards, excepting that he did state that they might work as laborers under him on said ranch and to that extent participate in the operation of the ranch . . .''

Charles argues that as to the financial and executive phases of the management of the partnership venture plaintiffs participated fully. He bases this argument upon the finding that plaintiffs participated in particular phases of the partnership business and had access to certain of its financial records. These findings recite that plaintiffs, since this action was filed, have examined all bills from concerns with which the partnership did business and the periodic statements of the orange and lemon organizations through which the partnership marketed its citrus products, but prior thereto plaintiffs were permitted to examine only a portion of the statements from the marketing groups; that they have been permitted to inspect all payrolls, and, since the filing of the action, one of plaintiffs has signed with defendant all checks drawn on the partnership bank account, and have discussed with defendant the purpose for which the checks were drawn and the propriety or impropriety of their issuance. After the employment of a certified public accountant plaintiffs, from time to time, received copies of the periodic audits. They joined in the execution of marketing agreements covering all the orange crops with one exception, joined in the execution of crop mortgages, promissory notes and refinancing arrangements. In this connection it is to be noted that the court further found that ''said acts of the plaintiffs have been in the nature of checking on or examining the acts of the defendant after they were done, and they have been prevented by defendant from consulting with him and participating with him in decisions relating to expenditures or the operation of the ranch before they were done.''

This explanatory finding derives inferential support from the nature of the items in which plaintiffs participated and the character of their participation. For example, it is plain that the participation of all partners in the execution of promissory notes and the refinancing program was essential to the very existence of the enterprise. On the other hand inspection of the payrolls, cancelled checks, and reports from the marketing organizations, while important, obviously falls short of managerial participation.

Further support of this explanatory finding is furnished by the testimony that in February, 1946, defendant, without

consulting plaintiffs, borrowed $10,000 from Mr. Chess, who owned a large citrus packing plant, securing the same by a crop mortgage, and that Charles endorsed plaintiffs' names on three checks totaling more than $8,000 and opened a new bank account without their knowledge so that the plaintiffs would not know what defendant was doing. Defendant's position in this entire matter appears to be accurately reflected in his statements to one of plaintiffs' attorneys, prior to the filing of this action, to the effect that he was manager of the ranch and as manager he would decide matters of policy; that he was the oldest brother and his younger brothers had no right to ask him any questions regarding their dealings, and that being the oldest brother it was his province to make the decisions for the "brotherhood" as he called it. This attitude undoubtedly accounts for the fact that upon various occasions prior to this action it was necessary for plaintiffs to go to the orange packing house, the lemon association, and to the banks to ascertain the financial condition of the partnership business. Without further detailing the evidence, it is clear there is ample support for the court's finding that defendant excluded plaintiffs from participation in the management and operation of the ranch.

Not only did the defendant usurp the management and direction of the partnership enterprise, but, in violation of the plain terms of the partnership agreement, he refused to sign a promissory note secured by his interest in the ranch in favor of his brothers for the $25,000 which they advanced as his share of the down payment. Defendant's refusal cannot be justified upon the ground that the note was only payable out of funds from either the operation or sale of the ranch. Such a note was property to which plaintiffs were entitled. They might have desired to discount it, put it up as collateral, or just hold it and draw the interest. Defendant also seeks to excuse his failure to execute the note secured by his interest in the property upon the ground that the parties did not obtain title to the ranch until March, 1948. However, it would not have been a difficult matter to prepare and execute a document which would have been a substantial and good faith compliance with the provisions of the partnership agreement and which would have constituted a strict compliance upon the actual acquisition of legal title. Defendant may not excuse his failure to execute such a note, with the required security, on the ground that plaintiffs did not present the documents for his signature, since he had stated that he

would not sign such a note under any circumstances. ■ The law does not require a person to do an idle act.

■ Because of defendant's arbitrary attitude and unwarranted refusal to give plaintiffs any substantial or sustained voice in determining managerial policies or any responsible part in operating the ranch, and because of defendant's apparent deliberate violation of the partnership agreement, the court was justified in concluding that defendant had wrongfully caused the dissolution of the partnership. As a consequence it was proper to apply the sanctions of section 15038(2b) of the Corporations Code and permit plaintiffs to purchase defendant's interest and continue the business provided plaintiffs may be considered innocent parties in the vicissitudes of the partnership leading up to its dissolution.

■ On this point defendant contends that plaintiffs are not in court with clean hands. In support of his contention he points to the manner in which plaintiffs got possession of a check made out to defendant and his wife and the plaintiffs in the sum of $51,418.81 and the disposition plaintiffs made of the funds derived therefrom. This transaction took place in May, 1949, some three years after this action was filed. The check grew out of the refinancing of the ranch through a loan of $160,000 from the Prudential Life Insurance Company. After the existing indebtedness of the partnership was paid the escrow company issued its check for the balance of $51,418.81 and delivered it to Charles. He and his wife endorsed the check and delivered it to the bank for credit to the partnership account. The bank manager asked plaintiffs to endorse the check which they declined to do, requesting, however, that they be permitted to take the check for the purpose of showing it to their attorney. This request was refused. A few days later plaintiffs came into the bank again and asked the manager to see the check. He produced it and stepped back to his desk to answer the telephone. When he returned to the counter plaintiffs and the check were gone. They cashed the check through their own banking facilities and deposited the proceeds as follows: $9,418.81 was deposited to the partnership bank account, $14,000 each was paid to Nick and Ernest, and the remaining $14,000 was applied by them to the credit of Charles on account of the $25,000 they had advanced for him on the purchase of the ranch. Plaintiffs notified defendant of the manner in which the proceeds of the check had been disbursed. The court found that plaintiffs knew such disbursal was against the wishes of

defendant, but that they believed they had a right to thus disburse these funds under the partnership agreement. Defendant, however, challenges this finding as being without any evidentiary support. It is true, as the court also found, that the partnership agreement did not authorize such distribution of this money but it was not unreasonable for the court to infer from all the circumstances that these businessmen considered the money thus realized from the refinancing of the ranch as having been accumulated from its operations. Plaintiffs had reason to regard the major portion of the proceeds from this check as in the nature of an accumulation and available for distribution because they had insisted that the Prudential loan should be $110,000 instead of $160,000. This would indicate that they did not believe it necessary to have a large amount of additional working capital. They did, however, put $9,418.81 into the partnership account. Thus they could reasonably conclude that the $42,000 was available for distribution. That this appraisal of the partnership needs for operating funds was reasonably good is indicated by the court's finding that the $9,418.81 deposited by plaintiffs in the partnership account, together with other income from the ranch, was sufficient to pay the usual operating costs, and that the erroneous distribution of the $42,000 by the plaintiffs did not impede, delay or damage the ranch operations or impair the credit of the partnership. Taking into consideration all the facts and circumstances surrounding this $51,418.81 check the trial court could reasonably infer that plaintiffs did not intend to cheat or defraud defendant (*Belling* v. *Croter,* 57 Cal.App.2d 296, 306 [134 P.2d 532]) and that this misapplication of the $42,000 did not injure him or the partnership. (*Wiley* v. *Wiley,* 59 Cal.App.2d 840, 842 [139 P.2d 950].) Consequently the court was not required to find plaintiffs were in court with unclean hands and therefore not entitled to purchase defendant's interest under section 15038(2b), Corporations Code. (*Watson* v. *Poore,* 18 Cal.2d 302, 312, 313 [115 P.2d 478] ; *Tobola* v. *Wholey,* 75 Cal.App.2d 351, 358 [170 P.2d 952] ; *Belling* v. *Croter, supra.*)

The trial court erred in failing to require plaintiffs to indemnify defendant "against all present or future partnership liabilities" as provided in section 15038(2b), Corporations Code. A large portion of the Prudential loan is apparently unpaid and has a number of years still to run. Also, the 20-year marketing agreement executed with the Chess packing house is an item of substantial importance. Under the plain

language of the section defendant is entitled to be protected against these and other liabilities. The amount and character of such indemnity should be fixed by the trial court upon the taking of such evidence as may be required.

Defendant insists there was no "agreed term for the partnership" hence section 15038(2b), Corporations Code, is not applicable and for that reason plaintiffs are not entitled to purchase his interest in the partnership.* It is true the agreement does not mention the term of the partnership. But it does provide that money advanced by one partner to enable another to make his share of the down payment shall be repaid "only out of funds accumulated from the operation of the ranch or a sale" thereof. This seems to negate any idea of partnership at will for it cannot be assumed that it was the intention of the parties that the borrower was at liberty to walk out of the partnership until the loan had been paid from either the operation or sale of the ranch. In this respect, the case is strikingly similar to *Owen* v. *Cohen*, 19 Cal.2d 147 [119 P.2d 713], where, as here, the parties did not expressly fix any definite period of time for the duration of their undertaking. There, one of the partners advanced a substantial sum to the partnership for the purpose of buying necessary equipment with the understanding that the advance was to be considered a loan and was to be repaid to the lender out of the prospective profits of the business as soon as it could reasonably do so. In holding (contrary to the finding of the trial court) that this was not a partnership at will the Supreme Court pointed out that "While the term of the partnership was not expressly fixed, it must be presumed from this agreement that the parties intended the relation should continue until the obligations were liquidated in the manner mutually contemplated." (P. 150.) In the instant matter there was a definite and "particular undertaking" (see § 15031(1)a & b, Corporations Code) voluntarily agreed to by all the parties, and the duration of the venture was, at least impliedly, until the $25,000 which had been advanced by the plaintiffs for the benefit of Charles had been paid in the manner provided in the partnership agreement. (*Zeibak*

---

*Section 15038(2b) reads in part: "The partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name, . . . may do so, during the agreed term for the partnership and for that purpose may possess the partnership property; provided, they . . . pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, . . . and . . . indemnify him against all present or future partnership liabilities."

v. *Nasser,* 12 Cal.2d 1, 13 [82 P.2d 375] ; *Meherin* v. *Meherin,* 93 Cal.App.2d 459, 463 [209 P.2d 36] ; *Owen* v. *Cohen, supra.*) The partnership was therefore not at will but for an agreed term.

The evidence on this trial was concluded on June 15, 1950. The court filed a memorandum opinion and caused a minute order to be made on June 30th ordering judgment for plaintiffs and fixing the date of dissolution as July 15th. The interlocutory judgment, however, was not filed until March 27, 1951, and the final judgment was entered October 16, 1951. Defendant insists that it was error to fix the date of dissolution as of a time prior to judgment. He argues that June 15th is wholly without significance.

It is, of course, clear that a court may, because of a breach of the partnership agreement, decree the dissolution of the partnership as of a date prior to the judgment. In some cases where the breach is serious and unequivocal the dissolution may be decreed as of the date of the breach. In such cases the misconduct really dissolves the partnership, the court decree merely giving legal effect thereto. But here the act of Charles in excluding plaintiffs did not *ipso facto* dissolve the partnership. His acts simply provided grounds for an application to a court of equity for such relief. (*Zeibak* v. *Nasser, supra,* p. 16.) Upon having heard all the evidence the court properly concluded that the partnership could not go on and consequently had to decree its dissolution and fix a date upon which the respective interests of the partners would be determined. Here the court chose the date upon which the introduction of evidence was concluded. Such a date was entirely reasonable since the whole story of the controversy was before the court as of that time. (See *Zeibak* v. *Nasser, supra,* pp. 14-16.) Defendant is not prejudiced by fixing that date because, as we hereafter point out, he is still entitled to his pro rata share of the profits.

Defendant contends that the court erred in refusing to reopen the case for further evidence relative to the value of the partnership property. He argues that during the trial there was no indication that the question of the value of the ranch would become vitally important or that one of the parties would be allowed to purchase the interest of the other at a price fixed by the court. The record, however, does not support the argument. At the very outset of the trial the judge called attention to the possibility that in the event of a decree of dissolution the innocent party might be given the oppor-

tunity of buying out the other party at a value to be fixed by the court; that "both parties should be concerned with fixing the true valuation"; that these issues should not be separated; and that "the court should consider both the issues as to the conduct of the parties and the valuation of the property at the same time so that . . . all of the issues may be determined at the same time . . ." Again, when both sides rested, the court called attention to the importance of the testimony concerning the value of the property, suggesting that a session be held that afternoon at which time the parties would again take the witness stand and be examined by the court as to the bases of their respective valuations. This suggestion was followed, each of the parties being given an opportunity to state the reasons for the value he placed on the property. There was then no request by defendant that the court should appoint an expert appraiser. The case was thereupon argued and submitted, and decided some two weeks later. It was not until then that defendant sought to reopen the case in order to introduce expert testimony relative to the value of the ranch.

The ruling on such a motion is largely a matter of discretion. Here the court called attention to the matter of the valuation of the ranch twice during the course of the trial, and, on its own motion, took steps to explore the reasons for the valuation which the parties had given. They had been adequately warned of the importance of the issue, and had ample opportunity to suggest the advisability of expert testimony. It cannot be said, as a matter of law, that the court abused its discretion in refusing to reopen the case to hear such additional evidence.

Defendant also argues that the valuation of $235,000 fixed by the court is not supported by credible evidence. The partners, as owners, were, of course, competent witnesses on that question. In estimating the value of the ranch at $200,000 Ernest explained that their groves had gone down in value, in quality, and in relative standing with other groves that patronized the same packing house. He also indicated that the market price of citrus groves had declined considerably since they purchased this property in 1944. Charles, however, placed the value at $275,000 and insisted that their groves were in good condition. It was for the trial court to determine the credibility of the witnesses and the weight to be given their testimony. Certainly it cannot be said as a matter of

law that the court's valuation of the ranch does not have substantial, credible support.

Defendant contends that the court erred in terminating his right to participate in the profits of the partnership as of January 1, 1951, which was prior to the winding up and termination of the partnership and 10 months prior to the rendition of final judgment. ■ This argument is well founded, being in accord with the principle that where the business of a partnership is continued after dissolution with the employment of the assets of the retiring partner, the latter is entitled to a pro rata share of the profits, based upon the value of his interest in the partnership ascertained as of the date of dissolution. (*Ruppe* v. *Utter*, 76 Cal.App. 19 [243 P. 715]; *Hall* v. *Watson*, 73 Cal.App.2d 735 [167 P.2d 210]; 40 Am.Jur., Partnership, p. 388. See Annotation, 80 A.L.R. 12.) ■ This derives from the fundamental fact that a partnership is not terminated by its dissolution, but continues until partnership affairs are wound up. (Corp. Code, § 15030; *McNeny* v. *Touchstone*, 7 Cal.2d 429, 437-438 [60 P.2d 986]; *Citizens Nat. T. & S. Bank* v. *McNeny*, 10 Cal. App.2d 488, 490 [52 P.2d 492].) ■ The mere fact that the court decreed a dissolution by applying the sanctions expressed in section 15038(2b) of the Corporations Code does not justify the imposition of a drastic penalty not only outside the contemplation of the statute, but contrary to established law and equitable considerations. By invoking section 15038 (2b) defendant is obliged to retire from the partnership and he loses his right to any share in the good will of the enterprise. However, he is not required to forfeit the share of the profits of the business earned by the use of his assets subsequent to the dissolution.

■ In this connection section 15042 of the Corporations Code* has a material and significant bearing on the rights of the parties in the circumstances here under consideration. That section relates to the situation where a partnership is

---

*Section 15042 reads in part:

"When any partner retires . . . and the business is continued under any of the conditions set forth in Section 15041 (1, 2, 3, 5, 6), or Section 15038(2b) without any settlement of accounts as between him . . . and the person or partnership continuing the business, unless otherwise agreed, he . . . as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; . . ."

dissolved and the business is carried on "under any of the conditions set forth in section 15041 (1, 2, 3, 5, 6) or section 15038(2b)." The conditions thus referred to are where the business is continued without liquidation of the partnership affairs (see *Jacobson* v. *Wikholm*, 29 Cal.2d 24 [172 P.2d 878]) or, paralleling what occurred in the present case after June 15, 1950, where, after a partner is retired by a dissolution under section 15038(2b), the business is continued without a liquidation of the partnership and "without a settlement of accounts." In such a situation section 15042 provides that the retiring partner, as against the partners continuing the business, "may have the value of his interest at the date of dissolution ascertained, and shall receive . . . an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership." From the position defendant has taken on this appeal it is fair to say that he has elected to take profits rather than interest on the value of his share in the partnership.

An application of this principle is clearly reflected in the case of *Nuland* v. *Pruyn*, 99 Cal.App.2d 603 [222 P.2d 261]) (hearing denied by the Supreme Court), which involved the rights of a partner in a business which was taken over by another partner and the use of joint partnership assets and property continued after dissolution without an accounting. The court there states: "If the partnership was . . . rightfully dissolved on September 6, 1944, appellants' rights would have been as follows: They would have been entitled to have their ownership in the assets determined as of that date and paid over to them in money or in kind; if this was not done and their property was used in the business they would have had, on account being taken, an election to receive their property and to share in the profits made thereafter in the proportion their property bore to the whole or to be paid interest on the value of their property so used." (P. 613.)

In the instant case, the court fixed the date of dissolution as of June 15, 1950. Defendant was entitled to have the value of his interest in the business fixed as of that time. In ascertaining such interest not only is the value of the ranch to be considered as of that date as well as other capital assets, liabilities and expenses, but also the claims which the partnership had against the brothers and their set-offs among themselves should have been computed as of June 15, 1950, with

interest to that time. This was never properly done. Meanwhile the business operations were continued, using joint partnership assets to accumulate further profits. Defendant was allowed to participate in profits only as of January 1, 1951, although the business continued without interruption and no settlement of accounts had been accomplished. It is clear that the accounting ordered by the court in its interlocutory decree of March 27, 1951, was patently based upon erroneous principles, the court having failed to properly provide for the correct ascertainment of Charles' interest as of June 15, 1950, and having failed to make provision for determining his pro rata share of profits earned after dissolution. Under these circumstances the court's order for an accounting without due regard for the requirements mentioned had the effect of depriving Charles of his rightful share as a retiring partner in a continuing business whose accounts were not properly settled, and he was not required to accept the offer made to purchase his share after the rendition of final judgment, since the accounting should have proceeded "upon different principles than did the accounting which was actually taken." (*Nuland* v. *Pruyn, supra.*) ▮ Furthermore, it appearing from the briefs and from the oral argument that the status quo with respect to the partnership operations has remained unaltered during the pendency of this appeal, defendant is entitled to his proportionate share of any profits which have accrued from the employment of his property in the business of the partnership while awaiting the final outcome of this appeal. (*Clark* v. *Jones,* 50 Cal. 425.)

▮ Also, in view of the time required to produce a citrus crop, and the employment of defendant's capital in the production thereof, it would be inequitable to cut off completely his participation in the proceeds therefrom upon the filing of the remittitur in the event there should then be such a crop substantially matured and soon ready for market. While no formula or precise definition can be laid down to determine when such fruit has substantially matured, this determination can properly be left to the sound judgment of the chancellor.

Defendant asserts that it was error to deny compensation to him for his services to the partnership from its inception to the date of final judgment. He relies upon a portion of the partnership agreement which reads: "The parties shall from time to time agree upon a fixed amount to be drawn by each party by way of a drawing account, living expenses

or wages." The mere recital of this clause establishes the weakness of defendant's claim. ▮▮▮ The general rule is that, in the absence of an express or implied agreement, a partner is not entitled to any compensation for his services to the partnership other than his share of the profits. (*Estate of McConnell,* 6 Cal.2d 493, 497 [58 P.2d 639] ; *Cook* v. *Bryson,* 89 Cal.App. 445, 447 [265 P. 289].) This is predicated on the theory that during the lifetime of the partners each of them is required to donate his time and talents to the affairs of the partnership, the service and labor of the one offsetting that of the others. (*Griggs* v. *Clark,* 23 Cal. 427.) ▮▮▮ The fact that one partner contributes greater skill and takes over the management of the business does not give rise to a right to extra compensation without an agreement therefor. (*Cook* v. *Bryson, supra*; 68 C.J.S., Partnership, p. 532.) An examination of the quoted part of the partnership agreement clearly indicates that although the fixing of compensation for *each* of the partners was in the contemplation of the parties, it was cast in the form of an agreement reserving this matter for future determination. However, the parties were unable to reach an agreement on this deferred subject. ▮▮▮ Under such circumstances, "neither law nor equity provides a remedy for breach of an agreement to agree in the future." (*Autry* v. *Republic Productions, Inc.,* 30 Cal.2d 144, 151 [180 P.2d 888]. See *Dillingham* v. *Dahlgren,* 52 Cal.App. 322, 330 [198 P. 832].) The court may not imply or speculate upon what the parties will agree. (*Autry* v. *Republic Productions, supra,* p. 152; *Kerr Glass Mfg. Corp.* v. *Elizabeth Arden Sales Corp.,* 61 Cal.App.2d 55, 56-57 [141 P.2d 938] ; *Dillingham* v. *Dahlgren, supra.*) A statement of this rule is to be found in Volume I, Williston on Contracts (1936), section 45, page 131, where the author says : ". . . if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the very terms of the promise may refuse to agree on anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise." There is no practical reason under the facts of this case to depart from these principles. Defendant's conduct was materially instrumental in preventing an agreement. Furthermore, defendant is in nowise prejudiced by failing to receive compensation, since plaintiffs would have been equally entitled to compensation for their services under the partnership agreement. Also, since de-

fendant is entitled to a share in the profits during the entire time his assets and services were employed by the partnership without a settlement of its accounts, he may not in addition claim an allowance for his services in the absence of an agreement therefor.

In a separate appeal, which has been consolidated with the appeal from the judgment, defendant appeals from a postjudgment order in which the court fixed the bond on appeal under section 945, Code of Civil Procedure, at $100,000. Defendant first contends that the judgment in the instant case is a "judgment directing the execution of a conveyance" within the meaning of Code of Civil Procedure section 944, and that defendant's compliance with the provisions of this statute by depositing with the clerk of the superior court a "Conveyance of Ownership Interest" suffices to invoke the statutory stay of execution on appeal. However, this contention is untenable when the judgment is considered in its entirety, as it must be, without isolating particular clauses from the context. (*Freeman* v. *Donohoe,* 188 Cal. 170, 172, 174 [204 P. 593].) It is clear from a reading of the whole judgment that it directs the sale of defendant's share of the partnership enterprise and delivery of possession to plaintiffs upon their payment of the purchase price. The language of the decree ordering the execution of the deed is merely ancillary to the principal purpose of the judgment which was to subject defendant's interest to a purchase by plaintiffs if they so desired, accompanied by a delivery of exclusive possession of the real property involved. Section 945 of the Code of Civil Procedure was, therefore, applicable and defendant was properly required to file an undertaking in compliance with the provisions of that section in order to stay execution of the appeal. (*Archer* v. *Miller,* 192 Cal. 67, 70 [218 P. 410]. See 40 Cal.L.Rev. 249, 263.)

Defendant further contends that, assuming section 945 to be applicable, the fixing of the bond at $100,000 is grossly excessive. This objection is well taken. Section 945 requires an undertaking to the effect that appellant will not commit waste, and, if the judgment is affirmed, that he will pay the value of the use and occupation of the property during the pendency of the appeal. While it is the function of the trial judge to fix the size of the appeal bond, this discretion must be exercised in a manner compatible with the potential injury which respondents might suffer during the period of appeal. Since defendant is not exclusive manager of the

partnership affairs, and his activities are subject to daily scrutiny by the other partners, it is clear that his opportunities to commit any extensive waste are limited. Furthermore, there is not the slightest intimation in the record that such acts of waste are contemplated and, in view of defendant's own interest in increasing the profits of the enterprise, it would be contrary to his economic interests for him to commit serious waste. So far as his use and occupation of the property is concerned, defendant and his family are in exclusive possession of only a small part of the ranch, he and his family residing on one of several houses on the property. In the light of all these facts the sum of $100,000 fixed for the undertaking on appeal was "excessive and an abuse of the discretion of the court." (*Huston* v. *Huston*, 87 Cal.App.2d 8, 10 [195 P.2d 551].) A bond in a much smaller amount would adequately protect the plaintiffs. It would seem that under all the circumstances a $20,000 bond would be ample.

A retrial of the issues is unnecessary, but an accounting must be had and a new judgment entered. The first phase of the accounting is for the purpose of determining the value of the respective interests of the partners as of the date of dissolution, viz., June 15, 1950. In arriving at that figure the valuation of $235,000 placed on the property by the trial court is definitive of that question. However, in determining the respective financial interests in the partnership business as of that date consideration must be given to the $25,000 which plaintiffs advanced for defendant, and to the $42,000 which plaintiffs improperly withheld and distributed, together with interest on said sums to date of dissolution. All other assets and liabilities of the partnership, together with any claims of the parties *inter se*, must be included in the ascertainment of the respective interests of the plaintiffs and the defendant.

The second phase of the accounting covers the period from June 15, 1950, to the filing of the remittitur herein. This should establish the net profits of the partnership for that period and defendant's share therein should be allocated to him in proportion to his interest in the business on June 15, 1950. The judgment should contain an appropriate provision permitting plaintiffs the privilege of purchasing defendant's interest in the partnership enterprise pursuant to the provisions of section 15038(2b) Corporations Code, and providing that in the event plaintiffs elect to make such purchase they shall pay defendant interest at the rate of 7 per cent per annum on the amount found to be due him as of the date of the remittitur

until paid. The judgment should also contain an appropriate provision for the indemnification of defendant in the event plaintiffs purchase his interest. (§ 15038(2b).) The judgment should further provide for defendant's participation, on a pro rata basis, in the proceeds of the sale after deducting picking and other marketing expenses of such, if any, of the citrus crop as may be substantially matured upon the filing of the remittitur. This provision should require plaintiffs to assign to defendant his share of the proceeds from such maturing crop so that they may be paid directly to defendant by the marketing organization, and thus not delay the accounting or rendition of a final judgment for this case has already been in the courts for almost seven years.

The judgment is reversed with directions to take the accounting and enter a judgment in accordance with the views herein.

The order fixing the bond on appeal is modified by reducing the amount thereof to $20,000, and as so modified, affirmed.

Plaintiffs shall bear one half of the costs on appeal, defendant the other half.

Moore, P. J., and McComb, J., concurred.